We'll go back on the record. Our next case is In Re Zoloft, number 16-2247. Thank you, your honors. I may appease the court. I'm David Frederick for the appellants, and with the leave of court, would like to reserve four minutes of time for rebuttal. That will be granted. The district court erroneously excluded the testimony of one of the world's greatest biostatisticians, Dr. Nicholas Jewell, under Daubert. The case has a lot of complicated features to it, so I don't want to use the focus... You said it, brother. This is a tough case. Let me try to make it simple for you in two ways. Reversal is required for two reasons. Number one, the district court simply overlooked the Weimacher study, which Pfizer presented into the record. Dr. Jewell testified about it, and it showed that there were significant, severe congenital heart defects that would be sufficient to warrant expert testimony about general causation. There's no discussion about Weimacher in the Daubert opinion. There's no discussion about Weimacher in the summary judgment opinion. Reversal and remand is required simply because there is probative evidence that supports the plaintiff's arguments about general causation on that basis alone. Before you dig too deeply, the very last line of Judge Wilson's opinion deals with Rule 403. It's not dealt with at all in the briefs. What should we do with that? It was one of the two bases, 702 and 403. I think that the core fundamental error here was excluding Dr. Jewell under Daubert, and the basis for doing so was the application of an erroneous legal standard. If you accept my submission about Weimacher, you can't have a judge deciding a case on general causation where the key study that comes out after the submission, and the judge simply ignores it. What should Judge Ruth have done? Judge Ruth should have analyzed Weimacher, should have concluded that it was a replicated study, should have concluded that it supported an association, and then should have analyzed Dr. Jewell's testimony with respect to the other Bradford Hill factors, which are well accepted in this court and in this circuit as necessary for general causation. Before you go too far, do you read the opinion as addressing association or causation? Well, it is addressing causation through the concept of association, and this is the second point that I want to make. But isn't association kind of a predicate to causation? Yes, and under this court's precedence, the first thing that the scientists would look at is, is there an association? Right. You can determine if there's an association on the basis of one study. What Judge Ruth did was... They would say you cherry picked a study out of the restatement. And let me go to the second error that I wanted to make. It's on page 60 of the joint appendix. It's at the back of the blue brief, and I'll just walk you through where this error occurred and why it requires reversal. If you happen to have the brief handy, it's real easy to show you. Page J, page 60. It's the district court's opinion on Daubert for Dr. Jewell. Where the judge says no replicated statistically significant findings from non-overlapping data, what Judge Ruth is doing there is imposing a legal standard on association that is far higher than the threshold... Isn't, isn't, isn't, counselor, isn't she making a legal, a factual finding? Let's, no. She can't be. So let's look at the citations that she uses. Why not? Why isn't that a factual finding? Look at footnote 15. Okay? Footnote 15 references two memorandum opinions concerning the expert testimony of Dr. Burrard. If you look at the pages that are cited, there is no scientific evidence in this record cited in those pages. The only citation is to the district court's opinion in Wade-Groh. Wade-Groh, in turn, only referenced the defense scientific expert for this proposition. So if this is a factual finding, it has to be reversed for clear error, because a district judge can't rely on the facts in another case in order to make a holding about in this case. Why not? Because there's no record evidence for that. This is a summary case in which the judge is saying... This, this, this, this, this is a review of what the experts are looking at in determining, as teratologists, I think I've got that right, what they have to look at. And it is a factual finding on the method and the basis teratologists have in making their decision. And that is not a finding of law. It's a finding of fact of what scientists do. But the judge didn't cite anything in this record for that proposition, Judge Roth. That's where the error is. The judge cited a district court opinion in another case that relied on the defendant's scientific expert and the proposition as a matter of law is incorrect. If you look at the First Circuit's decision in Millward, it goes right directly to the point that you made to open this, which is the threshold question is, is there an association? If there's an association, which you can show through one study, then you look at the nine Bradford Hill factors. The judge here ruled out Dr. Jewell on Daubert on that very first threshold question and didn't even analyze seven of the nine Bradford Hill factors. But was it necessary then to do it? Yes. Do you view her as saying, yes, there was an association, let's move on? No, what I'm saying is that what she did, the error here, was to go way beyond the normal Daubert gatekeeping role and to irrigate to the court the power to resolve and reconcile what is a very complicated epidemiological record. That's not what scientists do. What scientists do under this court's precedence, and I'm thinking about Gannon, DeLuca 1, the First Circuit's decision in Millward, is that if they determine that there is a scientific association, they then look at the Bradford Hill factors, which are contextual, and they go to things like the biological connection, and then they allow the process of cross-examination at trial to ferret out what the complicating factors are and allow the trier of fact to decide that. But she did a rather extensive hearing, didn't she? She did, but she was irrigating to herself the idea of reconciling these studies. And let me point out, and this is really crucial, I don't agree with you on that. I think she was determining how teratologists make their determinations, do their studies, not as a matter of law, but as a matter of fact. And it was her position that, as a matter of fact, what teratologists do is not what Dr. Jewell did, and therefore that his scientific technique does not conform with the accepted techniques in this field. With respect, Judge Roth, there is no citation by Judge Roof for that proposition other than Wade Groh. And the only citation in Wade Groh is to the defense's scientific expert, and that is inconsistent with all of the scientific approaches that courts take to these kinds of problems, which is to look and see whether there is an association, and if there is an association, then evaluate the nine Bradford Hill factors. Judge Roth, the whole reason why I point out this page is that I implore you to please trace back what the district court did, the analytical process, and look at the support that the judge invoked for that proposition. And I promise you there is nothing in this record that the judge cited on this teratological point. So as a matter of fact, if you determine it to be a factual finding, it has to be reversed for clear error. It has to be, because there is no scientific evidence to support that other than the defense's expert in Wade Groh. Now, one of the points that didn't impress the judge apparently was your, I don't know if it's Dr. Jewell or Mr. Jewell's, Dr. Dr. Jewell's inability, I guess, to reconcile the FURU 2015 study. How do you respond to that? Well, FURU actually supports the idea that there is a positive association. Now, it also has another side. The other side is that it cannot exclude the possibility of a null hypothesis. And that's where this whole question about statistics starts to get really confusing. FURU found that there was a positive association, the odds ratio was above one, but that when you looked at the confidence interval at a 95% probability standard, that the lower bound of it was below one. So as a statistical matter, what that means is that the study could not exclude the possibility of a null hypothesis, but nor was it not inconsistent with the idea that there was a positive association. And that's why this idea about statistical significance flows right into the Supreme Court's decision in Matrix, which says when you're doing these kinds of questions of causation in the medical field, you are not going to rely solely on statistical significance because there are a lot of other factors that go into play. And when you look at the nine Bradford Hill factors, one of them is the biological mechanism by which the drug could cause the potential birth defect. And here the judge accepted the three biological mechanism experts that were offered by the plaintiffs. So can we go back for a minute? I'm not sure if you answered this. If you did, I apologize. But you say a study, you know, pointing to the restatement. I mean, doesn't that encourage just cherry-picking one? I mean, from a person who may not be an expert, that would be me. But I mean, cherry-picking one study out, that's enough to meet the association threshold because of the Bradford Hill factors? What it does is it introduces the possibility of cross-examination. The whole Daubert standard was designed to get experts up before courts and juries and then have them be cross-examined. So, Judge, if you're right that there's only one study, and here we would submit that there are four studies that actually replicate at a statistically significant level, Which four? Peterson, Wiemacher, Jimenez, Solum, and Cornum. All four of those, three of them were the Danish studies. The judge basically treated them as one, thought that they had been superseded by Furu. I think I've addressed the Furu issue. But Wiemacher comes along after those with a much broader study, 2.1 million live births, and confirms that there is a statistically significant association. But the whole point, Judge Chigar, is that if you're right in your hypothetical, that there's only one study and there are all these other studies, then that expert is not going to hold up very well on cross-examination. What about the district court's gatekeeping function? The gatekeeping function determines whether or not you faithfully applied the step process. Is there an association? Is there a study that supports an association? If so, then look at the nine Bradford Hill factors. And the court for Jewell didn't do that at all. The court, in fact, didn't even address seven of the nine Bradford Hill factors because it was so hung up on whether or not it could fully flesh out the replication of these studies. And let me point out the implications of that rule. If that's the rule, either as a matter of fact, Judge Roth, or as a matter of law, what it means is that women who are taking these drugs while they're pregnant and their babies suffer birth defects will never have a remedy until 20, 30, 40 years after the fact until there can be a complete reconciliation of every possible epidemiological study. There's no court that I'm aware of that has imposed that strict a standard under Daubert to preclude that expert from being able to testify and be subject to the normal rules of cross-examination. If I could reserve the remainder of my time, unless you have questions for me now. Assume hypothetically that Judge Ruth was right, excluding this particular expert. Would that resolve the issue? Would it resolve the case in terms of summary judgment granted? Yes, because we had a general causation expert that was Dr. Jewell. We chose not to appeal Dr. Barrard's ruling, and so we acknowledge that if you agree with Judge Ruth about Dr. Jewell being properly excluded under Daubert, we would lose under summary judgment for general causation. All right. Thank you, counsel. We'll hear in a moment. Good morning, Your Honor. May it please the court, my name is Mark Sheffield and I represent Pfizer.  Thank you, Your Honor. The court, as you allude to, conducted ten full days of Daubert hearings in this case. The plaintiffs, as you know, have only appealed from one of the four decisions that Judge Ruth, you can't isolate them. I think I'd like to start, perhaps, where Judge Roth, you started. The plaintiffs have somewhat ironically tried to turn this on its head. At first, they argued in their papers that there was a bright-line legal rule that Judge Ruth was imposing, though yet they seem to come here today and argue that there's a bright-line rule that once you have one finding, the court's gatekeeper function is somehow abrogated and you have to pass. But here's what I would take, I think, strong issue with. As Judge Ruth spoke directly to this counsel, I think she said, I promise you and that you can search the record and you will find no evidence other than Waygro. That is, frankly, just demonstrably not true. In fact, at page 26 of our brief, we have, at the end, a number of findings. So, it is true that the court cited Waygro. She said, basically, in looking at her factual determination, what the court needed to do was everyone agrees that teratology and epidemiology are the appropriate disciplines here. So, the court needed to dig in and understand what it is that teratologists and epidemiologists do and how they determine causation. And that question was addressed by Judge Giles in the Waygro, which was ultimately affirmed by this court. And there, many years ago, the court said you need multiple studies, you need replication. Frankly, that's not really at issue here, but the court did. Well, hold on now. This may be a good time to bring this up. A study they pulled out of the commentary, out of the restatement. What's your position on that? Well, specifically, I think what the court said, again, this was under an abuse of discretion. You first have to start by saying, you know, how do teratologists and epidemiologists view causation? You know, would this be published in a peer-reviewed journal? And, of course, the answer to that is no. So I think the question, as Judge Roof says, I'm not drawing a bright line. You don't have to decide that one study does it or one study doesn't do it. But here, when you have kind of an overwhelming, crushing amount of information over the course of 20 years, you have to reconcile the studies. You have to first look if there is replication. And to that point, let me just address the Wemmicker study, because I think counsel talked about that at some length. What's, I think, fact in the record, he said, well, you know, you have no choice. There's a factual abuse of discretion because there, in fact, was replication. But, in fact, Dr. Jewell himself said the Wemmicker study is not replication because the only finding there was severe cardiac. So it doesn't replicate. The other thing that's interesting about the case is it was addressed at the hearing. So apparently it seems that counsel's view is, you know, unless you have a 1,000-page decision from a judge talking about everything, we are to ignore, you know, 10 days of hearings and mountains of paper and evidence in the record, which there is in the record. The other thing is there was no supplemental report in that case. So as important as counsel is now saying it is, there was never a supplemental report, and it was discussed and addressed at the hearing. So clearly Judge Roof understood the decision. And here's, I think, also the kicker for that is that the authors of the Wemmicker study, to the extent that we're going to kind of get in the weeds on that, they did not adjust for depression, alcohol, or smoking. So not only do you have Dr. Jewell saying it's not replication, the authors themselves said they didn't adjust for the confounding. And what they said was the authors, quote, cannot exclude confounding by indication or associated factors, and that their findings were, quote, compatible with confounding by depression as indication or other associated factors or exposures. So, you know, the idea that this is a slam dunk, silver bullet finding of Zoloft causes cardiac birth defects that's replicated, it's just simply not in the record, it's not accurate, it's not what the authors said, and that was all presented to Judge Roof. So I think what we have here is, you know, a judge who did an incredibly searching analysis, and I will tell you I stood up quite loudly after the first time and said there should be no doubted do-overs. In fact, there was, you know, seven days of hearings the first time the judge laid out a very methodical decision, three of them, where she said specifically, here's the flaws, here's the methodological flaws. The plaintiffs have not even appealed from those decisions. The plaintiffs then argued, you know, give us essentially another chance, which Judge Roof, in her discretion, do. I don't think she had to do, but she did. And then she methodically said, looking both at the record from the seven days, looking at all the science that's out there, looking at how teratologists and epidemiologists conduct causation analysis, she applied that appropriate analysis here. Well, that's one thing I want to get into. I started at the beginning asking your friend across the aisle, do you view the district court's opinion as dealing with association or causation? Well, I think that ultimately the question was general causation, right? So I think what Judge Roof appropriately said, and this is what Bradford Hill, Sir Bradford Hill, has said, and what virtually all of the authorities who work in this field say, that you first have to determine whether there is an association, right? A true association. And then if there is a true association, then you apply the Bradford Hill criteria. And everyone had agreed in this case, essentially you need replication, you need consistency. So she looked at what Professor Jewell had offered, and she said, well, as to these three Danish studies, there's overlap. And you haven't explained why you're doing that. And then she said, with respect to FRURU, if there was any open question, we now have a study in 2015 that has looked at essentially all of the population of those three studies, and there is no statistically significant association or findings. And that was kind of one of her core issues here, is that not only, you know, you can't cherry pick one finding and say that's it, no more analysis. It's the court's burden, I think, as a gatekeeper to then look and say, is there a true association? Do those studies constitute association? And here she gave, again, the plaintiffs every chance to determine that there was no association, I suspect. And she did discuss them in connection with Dr. Berard. She determined that she went further and discussed the Bradford Hill criteria. But to the extent that you don't have an association, you don't need to go further and discuss Bradford Hill with respect to causation. But the question, clearly, Your Honor, I mean, that's what this whole 10 days of hearing is about, was, you know, can Zoloft cause birth defects? Let me ask you a question. I mean, the court took issue, obviously, as we've talked about, with the absence of replicated statistically significant findings from non-overlapping data. Did the district court, do you think, invade the province of the jury by focusing on Dr. Jewell's conclusions as opposed to his methods? Not at all, Your Honor. And I think the judge was very, very clear about that. I mean, just like she didn't follow the conclusions of, you know, of Pfizer's experts, she very carefully dug in over, you know, 10 days of hearings and literally mountains of paper. And what we're talking about here is, as I said earlier, page 26, there's not just the expert reports from Dr. Jewell and Dr. Berard, but what she also looked at was things like the FDA. Has the FDA determined that Zoloft causes birth defects after all this? Absolutely not. Organizations like Otis that are folks that deal with birth defects, do they say that Zoloft causes birth defects? No. In fact, there's no regulatory agency, there's no government body, there's no peer-reviewed study, there's no health care organization in the world that says that Zoloft causes these birth defects. To some extent, and I say this respectfully, I think counsel has tried, and they're very good advocates, they've tried to kind of put Judge Roof on an island, that she somehow created this heightened standard of Daubert. But I would suggest, as they have suggested, that she's tried to create this kind of bright-line legal rule that unless you have a statistically significant finding, all else fails. But in fact, I would submit that the folks who are on the island are Dr. Berard and Professor Jewell, because no one supports what they're saying. And what I would also proffer is that if you really do take a step back practically and think about it, if in fact Professor Jewell had found something that no one else has found, that Zoloft causes birth defects, one would expect this to be published, to be peer-reviewed and subject. None of these opinions have been peer-reviewed in public, and in fact, what he's done, and this is one of the core criticisms, is that he's recalibrated and done post-hoc analysis of the experts in the field. So to answer your question directly, Your Honor, I'm sorry if I went a little bit on a tangent. I don't think that she has invaded any way the province of the jury, because I think a core principle here is the concept of reliability. And what Judge Roof, I think, starkly understood was that if in fact you get past the reliability, and this is a matter of two experts who have reasonably reliable opinions that differ, that's exactly what we're supposed to allow to go to the jury. But there is a threshold issue, a threshold inquiry about whether it passes Daubert and whether it passes the reliability standard, and that's what Judge Roof did exactly here. And it's consistent. How do you respond to your friend's comment that she did not consider the Bradford Hill factors or all of them? Well, I think, as I said earlier, I think the point is you don't get to Bradford Hill. You don't need to establish all of the Bradford Hill criteria unless you have a true association. And I think what Judge Roof found here and what she found in her three prior decisions was that based on all of the evidence, not just Wade Grove, not just the Wemerker study, but based on looking at everything, the plaintiffs had not established a strong association, so there was no need for her to chronicle it. So I'm just a little bit confused. So you're saying they did not meet the threshold of association. That's correct, Your Honor. Is that a factual or legal issue, whether or not there's an association? Is that a factual or legal issue? I think the approach of, well, I think the factional determination about how you meet an association, in other words, what the criteria are for how epidemiologists and teratologists, that is a factual determination. In other words, you need replication. You need consistency. So that is a factual determination that I think is subject to a higher standard. Ultimately, the only legal standard here is was summary judgment appropriate, and I think the answer to that is yes, having no experts. So I think, again, the core issue here is Judge Roof really became a student of science, probably not unlike many lawyers. I shouldn't say that. Maybe she was. But she tried to understand, I think over the course of a few years, by reading literature, taking experts, looking at peer-reviewed studies, looking at all of taking testimony from both sides, and how it would be that epidemiologists and teratologists would go about determining causation. And this is fully consistent with what, again, Judge Giles didn't way grow. I think it's consistent with this court, though it's unpublished, and the Pritchard case. The Magistrini case dealt with this same issue. I think DeLuca. So this is not kind of a novel concept that there are factual predicates and understandings of how you would go about determining causation. That's exactly what the court did. And I submit respectfully that's exactly what the kind of analysis that we want courts to do, is roll up their sleeves, understand what the appropriate methodology is in a particular field, don't create bright-line rules necessarily, but you can't ignore. Did Judge Roof create a bright-line rule with respect to replicated, consistent, statistically significant studies? I don't think she did at all. That issue was raised in connection with when she determined that Dr. Barard did not meet the standards under 702. The plaintiffs moved for reconsideration. They said, Judge, you got it wrong. In fact, almost the identical arguments here and, frankly, almost the identical arguments when I was reading the Pritchard case, I thought in some regards we could have changed the name. The plaintiffs argued there and here that you created a bright-line rule, and she said, absolutely not. What I did was what Your Honor, Judge Roth said, was I tried to understand, and I did a factual analysis of how you go about determining causation, and I scrupulously applied those standards and those factual findings to Professor Jewell. I think when you do that, there's really, you know, she chronicled fatal methodological flaw on top of flaw, and it wasn't just about statistical significance, as Your Honors know. I mean, she talked about overlapping data. She talked about post-hoc reanalysis of data. She talked about discounting meta-analysis that Professor Jewell had relied on in the Prozac litigation. She talked about how an author says one thing, and Professor Jewell reads the study and says something else. All of this without explaining in the entire context, because you have to understand there's a huge amount of information. This is not a case where you have a new medicine come on the market. You know, maybe there's one study. That's maybe a case for another day, for Your Honors, to deal with. Here we have a medicine that's been on the market for literally decades. It's widely and hugely studied, and the information and data that has come out, in fact, the most recent data, all of it, all of it suggests no association, much less causation. There's a million-women Hybrex study from Harvard that was published. There's the FURU study, which deals with the Danish information. There's the CDC commission to study. FURU is the most recent one, right? FURU is one of the most recent. I think it's 2015. I think the Harvard study is 2015-16 as well. And the last thing I'll say, Your Honors, is that the way these – I see my time's almost up. May I just have 30 seconds? Sure, go ahead. Thank you, Your Honor. The way these studies work is that the early studies, what they're supposed to do – this is how science is supposed to work. They identify some issues, and they identify very few, but they identify a statistical finding, and many of them said, well, this may be confounding, but we need to look at that. In fact, then science did what it was supposed to do. They went back and they looked, and, in fact, all of these studies, the broader studies, said, yes, let's look at confounding. Is there something about the underlying disease state of depression that is causing these birth defects? And, essentially, to a one, they've all determined that they believe that it's not the Zoloft. There is other confounding, and, in fact, that's even what the Wemerker study said that came out recently. So unless you're honest, I have one more. I started off, actually, with your friend saying, well, what about Rule 403? It seemed that there were two bases that she barred this expert on. Only one is dealt with in the briefs. What do we do with Rule 403? Well, I think, Your Honor, as you said, it was an independent ground, and it was, in our view, not addressed, not contested. So I think that that alone would be a basis, and I think one of the amicus folks kind of focused on that as well. So I think having not addressed it, not challenged it, plaintiffs have waived that issue, and that would be an independent basis to affirm. Thank you. Thank you, Your Honor. Judge Segar, let me start with the 403 point. The judge did no independent analysis, and so there's no basis independently to affirm. All of the analysis that was done was done under Rule 702. So if you were to affirm on a Rule 203 basis, you wouldn't have a record on which to do so. Judge Roth, if I can go back and make another stab at the teratology point about the fact-finding. I don't agree with the idea that teratologists generally require replication. But if they do, Judge Ruth didn't cite any evidence of that in the various opinions that she wrote on this subject. None. The only authority that she relied upon was Wade Grove. But if the teratologists do do that, general acceptance is the old Frye standard, and the Supreme Court rejected that standard under Dawbert. The Supreme Court in Dawbert actually upheld this court standard in DeLuca 1. And in DeLuca 1, what this court said was, quote, even studies that each may be rejected as insignificant may be looked at collectively to be contradictory to the null hypothesis. That's at 911, F second at 948. So then if you look at the record in this case, I ask you to look at Joint Appendix 8391. On that page, Dr. Jewell looks at every single study. Every single study finds an odds ratio greater than one for some birth defect that one of these babies sustained after their moms took this drug. Where the dispute occurs is in the parentheses, which is the confidence interval for determining whether or not that odds ratio can be deemed to be statistically significant. So the whole fight here is not whether the studies show a positive association. They all do. Every single one of them. The debate is over how finally you calibrate the statistical significance of their findings. So then that leads you back, what does the law require? In the First Circuit, the Millward case said, if this is at 639, F third at 24, the district court, quote, erred in treating the lack of statistical significance as a crucial flaw. That's exactly what Judge Roof did here. Because what Judge Roof did was to say, simply because the confidence interval has a lower bound that could not absolutely reject the null hypothesis in some of the studies, means that in those studies that did reject the null hypothesis, that there was a lack of replication. But yet that gets exactly to the point of what is the jury to be doing here. It's the jury's province to take these battles of the experts that are all upholding proper methodology and determine on the basis of the gestalt of factors what is more probable than not, preponderance of the evidence. And what the judge did here was to say, I'm going to take that away because I determine that on the basis of these confidence interval statistics that I'm not satisfied that there is replication. So what do you call it? That's not her duty as a gatekeeper under Daubert? No. Her duty as a gatekeeper is to determine, is this a qualified expert who is using general methodologically appropriate means? And then once an association is established, which here four studies show an association, even if you accept the statistically significant confidence interval, four of them do that, the judge is not to then say, well, there are six or seven other studies that I don't think quite get to the same level of statistical significance. Mr. Shepherd made very important and good arguments that he can make to the jury or on cross-examination about the lack of peer review or confounding factors. But those are cross-examination issues that go to the weight because as this court held just last week in the Carlo case, quote, the question of whether a study's results were properly calculated or interpreted ordinarily goes to the weight of the evidence, not to its admissibility. That's the slip opinion in Carlo at page 49. Here we would submit respectfully, Judge Ruth worked very hard on this, but obviously asked the wrong question, which is whether the court can determine replication and not whether that goes to the weight of the evidence appropriate for the jury. All right. Thank you, counsel. Thank you. We want to thank counsel for excellent briefing and argument on this very challenging case. Can we ask the parties to get a transcript made and the clerk can help you with that and maybe you can split the cost.